# EXHIBIT "G"

Part I of II

**In the Matter Of:**

MCCOY V. TJX COMPANY

21-cv-04907

**TERESA MCCOY**

*January 18, 2022*



800.211.DEPO (3376)
EsquireSolutions.com

TERESA MCCOY                                      January 18, 2022
MCCOY V. TJX COMPANY                                             1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------
 3   TERESA MCCOY,
 4                   Plaintiff,
 5            -v-        Index No. 21-cv-04907
 6   THE TJX COMPANIES, INC.,
 7                   Defendant.
 8   ------------------------------------------------
 9
10        REMOTE VIDEOCONFERENCE DEPOSITION OF
11   TERESA MCCOY, a Plaintiff herein, taken by the
12   Defendant, on Tuesday, January 18, 2022, at
13   10:00 a.m., before Jeffrey Shapiro, a
14   Stenographic Reporter and Notary Public, within
15   and for the State of New York.
16
17
18
19
20
21
22
23
24
25
```



TERESA MCCOY                                          January 18, 2022
MCCOY V. TJX COMPANY                                                 2

1    A P P E A R A N C E S :

2    SIMMONS JANNACE DELUCA LLP

3        Attorneys for the Defendants

4        43 Corporate Drive

5        Hauppauge, New York 11788

6    BY:  MARY C. AZZARETTO, ESQ.

7

8

9    MICHAEL O'NEILL, ESQ.

10       Attorney for the Plaintiff

11       30 Vesey Street, Third Floor

12       New York, New York 10007

13   BY:  MICHAEL O'NEILL, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25



TERESA MCCOY                                    January 18, 2022
MCCOY V. TJX COMPANY                                           3

```
 1
 2
 3
 4
 5
 6        IT IS HEREBY STIPULATED AND AGREED by and
 7   between the attorneys for the respective parties
 8   hereto, that the filing, sealing and
 9   certification be, and the same are hereby
10   waived;
11
12             IT IS FURTHER STIPULATED AND AGREED
13   that all objections, except as to the form of
14   the questions, shall be reserved to the time of
15   the trial;
16
17             IT IS FURTHER STIPULATED AND AGREED
18   that the within examination may be subscribed
19   and sworn to before any notary public with the
20   same force and effect as though subscribed and
21   sworn to before this Court.
22
23
24
25
```



```
 1    Whereupon,
 2                     TERESA MCCOY,
 3    after having been first duly sworn, was examined
 4    and testified as follows:
 5                  DIRECT EXAMINATION
 6    BY MS. AZZARETTO:
 7         Q.    State your name for the record.
 8         A.    Teresa McCoy.
 9         Q.    What is your address?
10         A.    74 West 92nd Street, Apartment 6D,
11    New York, New York 10025.
12         Q.    Good morning.
13         A.    Good morning.
14         Q.    My name is Mary Azzaretto, and I
15    represent the Defendant, The TJX Companies Inc.
16    in this matter.  I'm going to be asking you a
17    series of questions this morning.
18              I see that you are a very swift
19    speaker, as am I.  This is unlike a normal
20    conversation and that we need to make sure that
21    only one of us is speaking at any given time,
22    that way the court reporter can take down
23    everything that is said.
24              So, I would ask that you just wait
25    until I completely finish asking my question
```

```
                            McCoy
 1
 2     before you begin to respond just so we don't
 3     speak over each other.  Also, the court
 4     reporter will be unable to take down any
 5     non-verbal symbols such as hand gestures or
 6     head nods or mm-hmms, so to keep all of your
 7     responses verbal, I would really appreciate
 8     that.
 9          And if you want to take a break for
10     any reason, let me know, we can do that, I just
11     ask that you answer any pending questions and
12     then we can certainly take a break?
13          Do you understand those instructions?
14          A.    Yes, I do.
15          Q.    Okay.  Have you taken any
16     medications this morning that would affect your
17     ability to testify today?
18          A.    No.
19          Q.    The current address that you gave,
20     74 West 92nd Street, how long have you lived
21     there?
22          A.    Approximately two and a half years.
23          Q.    With whom do you currently live
24     with anyone?
25          A.    No one.
```



```
 1                        McCoy
 2          Q.    Where did you live prior to that?
 3          A.    A lived in a rehabilitative
 4    facility called Coler Nursing Home and
 5    Rehabilitative Facility.
 6          Q.    That's K-O-H-L-E-R?
 7          A.    C-O-L-E-R.
 8          Q.    And where is that located?
 9          A.    It's on Roosevelt Island in New
10    York 10044.
11          Q.    Back on July 28th of 2019, where
12    were you living at that time?
13          A.    Here at 74 West 92nd street.
14          Q.    Okay.  Was anyone living with you
15    at that time?
16          A.    No.
17          Q.    What type of facility is the Coler
18    Rehabilitation facility?  What type of
19    rehabilitation do they do?
20          A.    They do various forms of physical
21    rehabilitative facility, and I think that
22    there's -- there's a part of it that might deal
23    with long-term care.
24          Q.    And were you there for any type of
25    physical ailments?
```



```
1                          McCoy
2          A.     Yes.  I was in a wheelchair.
3          Q.     And do you have a particular
4    condition that puts you into that wheelchair?
5          A.     My ankylosing spondylitis at the
6    time, I wasn't being treated for it.
7          Q.     Ankylosing spondylitis, what is
8    your understand of what that is?
9          A.     Well, it is an auto-immune disease
10   in nature, in the sense that it -- my immune
11   system sort of attacks itself.  And in this
12   case, it's my spine, the cervical and the
13   lumbar and the sacroiliac, and it fuses in some
14   parts of the vertebra.  And it is -- there is a
15   predisposition, a genetic predisposition to it,
16   and it's degenerative.
17         Q.     Now, we will get more into that
18   when we get to the damages portion, but for now
19   I'm just going to ask, when were you first
20   diagnosed with ankylosing spondylitis?
21         A.     Honestly, I'm not exactly sure.
22   Maybe 20, 30 years ago.  I believe I have a
23   gene for it.
24         Q.     What is your marital status?
25         A.     Single.
```



```
 1                          McCoy
 2          Q.    Do you have any children?
 3          A.    No.
 4          Q.    Have you ever been known by any
 5     name other than Teresa McCoy?
 6          A.    No.
 7          Q.    What is your date of birth?  And we
 8     could leave it off the record, if you'd like.
 9              MR. O'NEILL:  Well, why don't you
10          just take the -- I've given it to you in
11          the answers to interrogatories.
12              MS. AZZARETTO:  Understood.
13              MR. O'NEILL:  I don't want it in the
14          transcript.
15              MS. AZZARETTO:  I just said we can
16          keep it out of the transcript, I'd just
17          like to hear her say it, we can keep it
18          completely off.
19              MR. O'NEILL:  So, it's off the
20          record?
21              MS. AZZARETTO:  Yeah.
22     BY MS. AZZARETTO:
23          Q.    You can answer, Ms. McCoy, we're
24     not going to put it in the transcript, it's
25     just for my notes.
```



```
 1                         McCoy
 2          A.    Can you repeat the question?
 3          Q.    Sure.  What is your date of birth?
 4          A.    (Answer off the record.)
 5          Q.    And what is your Social Security
 6     number?  Same thing, we can leave it completely
 7     off the record.
 8               MR. O'NEILL:  I don't think you're
 9          entitled to her Social Security number,
10          so I'm going to instruct her not to give
11          that.
12               MS. AZZARETTO:  I'm definitely
13          entitled to a plaintiff's Social Security
14          number on a personal injury action.  But
15          if you want, we'll mark it for a ruling.
16               MR. O'NEILL:  Okay.
17               (So marked for a ruling.)
18     BY MS. AZZARETTO:
19          Q.    Are you a U.S. citizen?
20          A.    Yes, I am.
21          Q.    Are you currently employed?
22          A.    No.
23          Q.    What's your highest level of
24     education?
25          A.    Midway through college.
```



```
                              McCoy
1
2        Q.     Where did you go to college?
3        A.     I began at NYU, and then years
4   later, I continued on at Hunter.
5        Q.     When did you attend NYU?
6        A.     Thirty-five years ago.
7        Q.     Did you major in any particular
8   area?
9        A.     No, it was beginning, it was the
10  earliest stage, so there was no major at that
11  time.
12       Q.     How long did you go to NYU?
13       A.     One semester.
14       Q.     For what reason did you stop, if
15  any?
16       A.     I was living with someone, we were
17  essentially married and living together, and he
18  was French, we travelled quite a lot and it
19  just became impractical.
20       Q.     Were you legally married?
21       A.     No.
22       Q.     When did you go to Hunter College.
23       A.     In the 2000s and the last semester
24  I attended was 2009.
25       Q.     How long did you go to hunter for?
```



```
 1                    McCoy
 2       A.    Two years.
 3       Q.    Did you major in any particular
 4  area?
 5       A.    English.
 6       Q.    Did you receive a degree from
 7  Hunter?
 8       A.    Not yet.
 9       Q.    Are you still attending, currently?
10       A.    I would like to.
11       Q.    Are you currently enrolled?
12       A.    No.
13       Q.    Do you have plans in the future to
14  re-enroll, so to speak.
15       A.    I would like to.
16       Q.    Do you have any plan to do that as
17  of right now?
18       A.    No.
19       Q.    Why did you stop attending Hunter
20  College?
21       A.    It became -- it just became
22  impractical, I was doing it part-time while I
23  was working, and it was -- it was a lot to
24  juggle.
25       Q.    Do you hold any type of
```

```
1                         McCoy
2    professional licenses or certifications?
3         A.    No.
4         Q.    You mentioned that you're not
5    currently employed.
6              When were you last employed, if at
7    all?
8         A.    Well, for many years I worked for
9    myself.  So, I would say the last time would
10   have been 2010, 2011.
11        Q.    What did you do at that time?
12        A.    I had a production company and I
13   did various producing and consulting.
14        Q.    Is that for television or something
15   else?
16        A.    Film, television, books, media.
17        Q.    And you were the owner of that
18   company?
19        A.    Yes.
20        Q.    And how long did you do that for?
21        A.    Thirty years.
22        Q.    So, you began approximately 1980?
23        A.    In my -- yes, absolutely.  The
24   company, yes.
25        Q.    And does that company till exist?
```



```
 1                         McCoy
 2          A.    No, it doesn't.
 3          Q.    What happened to that company?
 4          A.    I disbanded it.
 5          Q.    When was that?
 6          A.    Officially, technically, I think
 7    maybe 2019, but I hadn't been -- yeah, about
 8    2019.
 9          Q.    Had you been actively working in it
10    at that time or something else?
11          A.    No.
12          Q.    When had you last been actively
13    engaged in that business?
14          A.    2014, 2013.
15          Q.    And the business just existed
16    during 2014 and 2019 without any actual
17    business taking place, would that be accurate?
18          A.    I was doing -- yes -- no, there was
19    some business taking place, but it wasn't as --
20    I was doing -- selling some art, so I was
21    selling it through the company that the company
22    owned, and it was more -- it was not as
23    involved, I didn't do as much.
24          Q.    So, from 2014 to 2019, you were
25    doing less through the company, including
```



```
 1                     McCoy
 2   selling art; is that correct?
 3        A.    Yes.  Well, 2017, I was living in
 4   the rehabilitative facility and trying to get
 5   better, so I was doing very little.
 6        Q.    Is that the reason why the company
 7   ultimately was disbanded or something else?
 8        A.    Yes.
 9        Q.    What was the name of the company?
10        A.    McCoy Projects Inc.
11        Q.    Do you have any intention of
12   starting up that company again, or starting any
13   new companies of your own at this time?
14        A.    No.
15        Q.    Other than McCoy Projects Inc.,
16   have you been employed in any other capacity
17   over the last 30 years?
18        A.    Well, my company would get hired by
19   other companies to perform various projects.
20        Q.    So, you would work for other
21   companies through your own company?
22        A.    Yes, that's it.
23        Q.    On July 28th of 2019, was that
24   company actively operating?
25        A.    No.
```



```
 1                      McCoy
 2        Q.    I keep saying that day, July 28th,
 3   2019.
 4             Is it your understanding that that was
 5   the date of incident that is the subject of
 6   this lawsuit?
 7        A.    I think it is.  I don't have
 8   anything in front of me, so -- but it wasn't --
 9   it was in late July and in 2019, so I'm
10   assuming that is.
11        Q.    Okay.  Do you currently receive any
12   form of income?
13        A.    I receive SSI.
14        Q.    When did you first start receiving
15   SSI?
16        A.    I received -- I was approved for it
17   when I was living in the facility, but you are
18   only limited to a certain amount of money when
19   you're there.  So, when I left, that's when I
20   started to receive the full amount.  So, I
21   think that was -- I'm not sure.  It might have
22   been July, it might have been June of 2019, I
23   don't recall the specific date.
24        Q.    The date of the accident that is
25   the subject of this lawsuit, do you recall if
```



```
 1                    McCoy
 2  you were receiving SSI at that time?
 3       A.    Yes, I would have been.
 4       Q.    And how much were you receiving at
 5  that point?
 6       A.    I don't exactly recall, maybe -- I
 7  don't know the specific number, maybe $900 a
 8  month.
 9       Q.    And I understand it's an estimate,
10  that's fine.
11            Are you still receiving SSI,
12  currently?
13       A.    Yes.
14       Q.    Is it still $900 a month or has it
15  changed?
16       A.    It might be a little bit more than
17  that.
18       Q.    Other than the SSI, do you
19  currently receive any other form of income?
20       A.    No, I receive -- no, not income.
21       Q.    Do you receive any other type of
22  finances --
23            (Talking over each other.)
24       A.    I receive SNAP benefits.
25       Q.    And what are SNAP benefits?
```



```
  1                         McCoy
  2         A.    It's like Food Stamps.
  3         Q.    How long have you been receiving
  4   that?
  5         A.    The same amount of time.
  6         Q.    So, since approximately 2019?
  7         A.    Yes.
  8         Q.    How much Food Stamps do you
  9   receive, currently?  How does that work?
 10         A.    I think it's approximately $300 a
 11   month.
 12         Q.    Was that the same in July of 2019
 13   or was it different?
 14         A.    No, I think it was less.
 15         Q.    Do you recall how much it was in
 16   July of 2019?
 17         A.    Maybe $100 less.  I may be wrong.
 18   These are really just guesstimates.
 19         Q.    That's fine.  I don't want you to
 20   guess at anything.  If you can estimate, that
 21   is fine.  If you can't, just let me know.
 22         A.    It was probably $200, maybe a
 23   little bit more than that.  They recently
 24   increased the amount of SNAP benefits, so
 25   that's why it recently become more.
```



```
 1                          McCoy
 2          Q.     Where did your incident take place?
 3          A.     I'm sorry, can you repeat that?
 4          Q.     Sure.  Where did the incident take
 5  place?
 6          A.     My falling?
 7          Q.     Yes.
 8          A.      In the store -- in the HomeGoods
 9  store.
10          Q.     Where is that HomeGoods store
11  located?
12          A.      It's just up the block from where I
13  live.  I live off of Columbus Avenue and it's
14  up on Columbus, and let's see, about 100th
15  Street or something, it's across from Whole
16  Foods, I'm not exactly -- there's like -- it's
17  a little bit weird up there with the street, so
18  I'm not exactly sure whether it's like 100th or
19  101st Street, but it's around there.  It's on
20  the east side of Columbus Avenue.
21          Q.     And that's in New York, New York;
22  correct?
23          A.     Yes, New York, New York.
24          Q.     That particular HomeGoods store, is
25  it a standalone store, part of a shopping
```



```
 1                    McCoy
 2   center, something else?
 3        A.    They consider it a bit of like a
 4   strip mall, because there's a number of stores,
 5   there used to be a Modell's next to it and I
 6   know across the street there is a TJ Maxx and
 7   then the Whole Foods.  So, it's sort of
 8   considered to be like a bit of -- it's not like
 9   a mall because you don't go into it, but there
10   is a string of shops.
11        Q.    Had you ever been to that HomeGoods
12   store at any point prior to July 28th of 2019?
13        A.    I don't recall.
14        Q.    The HomeGoods store, how many
15   entrances and exits did it have for customer
16   use?
17        A.    As I recall, there is an in --
18   door -- glass door that allow you to go in, and
19   then right next to it are glass doors that
20   allow customers to exit.
21        Q.    How many levels was the HomeGoods
22   store for customer use?
23        A.    There is the main floor and they --
24   there is a basement.
25        Q.    When you first exit through that
```



```
 1                    McCoy

 2   entrance door, what is located there?  Is there

 3   an escalator, are you on a sales floor,

 4   something else?

 5        A.    Yes, you're on the sales floor.

 6        Q.    Now, you indicated that that store

 7   also has a basement.

 8              Was there an escalator going down a

 9   level in order to access the basement?

10        A.    There is no escalator, or if there

11   is, I don't -- I didn't see it.  There's an

12   elevator that goes down.

13        Q.    And where is that located in

14   reference to where you enter?

15        A.    It's in the back.

16        Q.    For what purpose, if any, did you

17   go to HomeGoods that day?

18        A.    To look for things for my new

19   apartment.

20        Q.    Approximately what time did you

21   arrive at the store?

22        A.    I don't recall.  I know it was in

23   the afternoon, I'm not exactly sure if it was

24   the early afternoon or the later afternoon, but

25   it was definitely after 12:00 p.m.
```



```
 1                      McCoy
 2        Q.    If I said around 3:45 p.m., would
 3   that refresh your recollection?
 4        A.    Yes, that might be accurate.
 5        Q.    How did you get to the store that
 6   day?
 7        A.    I walked up using a walker.
 8        Q.    Can you describe the walker that
 9   you were using on that day?
10        A.    It's called a Drive, it's
11   manufactured by Drive and it is -- the name of
12   it is -- I'm not -- there's a specific name to
13   it, but I'm not remembering it at the moment,
14   it's gray, it has two wheels in the back and
15   you can push it, and there is like a seat if
16   you need to sit on it.
17        Q.    How long had you been using the
18   walker as of that point in time?
19        A.    Probably for about a year.  A year.
20        Q.    And that was because of ankylosing
21   spondylitis; correct?
22        A.    It was because I had -- yes, I
23   was -- I had been transitioning out of a
24   wheelchair, we were trying to get me on a
25   correct medication.
```



```
 1                      McCoy
 2        Q.    So, you were out of the wheelchair
 3   as of that point; correct?
 4        A.    Yes.
 5        Q.    How long prior to that time was it
 6   you had been in the wheelchair?
 7        A.    Like a year.  I mostly took the
 8   walker so that I could -- if I thought about if
 9   I was going to bring anything back, that it
10   would be helpful to use it to bring something
11   back.
12        Q.    So, just to be clear because my
13   question wasn't before.  As of the date of this
14   accident on July 28th of 2019, you've already
15   been using that walker for approximately a
16   year; is that accurate?
17        A.    Yes.  At the facility, they sort of
18   insisted on it.
19        Q.    Okay.  Do you still have that
20   walker?
21        A.    Yes.
22        Q.    Do you still use that walker today?
23        A.    Yes.
24        Q.    Do you use it every time you leave
25   the house, only on certain times?
```



TERESA MCCOY                                    January 18, 2022
MCCOY V. TJX COMPANY                                          23

```
 1                        McCoy
 2         A.    Since the fall, I use it most of
 3    the time.
 4         Q.    Do you use it while you're in your
 5    own home, as well?
 6         A.    No, I don't.  I also have a cane
 7    which I use sometimes in the home.
 8         Q.    What level do you live on,
 9    currently?  I assume it's an apartment
10    building?
11         A.    Yes.
12         Q.    And what floor do you live on?
13         A.    On the 6th floor.
14         Q.    And is there an elevator that you
15    use to get in and out of the building?
16         A.    Yes, there is.
17         Q.    What was the weather like on the
18    day of your fall?
19         A.    I don't recall.  It wasn't raining.
20         Q.    What were you wearing that day?
21         A.    I don't recall.
22         Q.    Do you recall if you were wearing
23    pants, as opposed to a dress or a skirt?
24         A.    Oh, pants.
25         Q.    How about footwear, do you recall
```



```
 1                     McCoy

 2    your footwear?

 3         A.     Most likely sneakers.

 4         Q.     And again, I don't want you to

 5    guess.  Only what you remember.

 6         A.     Yes, Nike sneakers.

 7         Q.     Did you go to the store with anyone

 8    or were you alone?

 9         A.     Alone.

10         Q.     What had you done earlier that day,

11    if anything?

12         A.     I don't recall.

13         Q.     Was there any type of medication

14    that you took on a daily basis back on July

15    28th of 2019?

16         A.     Yes, I take taxol, approximately 30

17    milligrams on a daily basis and --

18         Q.     And what is that for?

19         A.     For generalized anxiety,

20    depression.

21         Q.     Okay.

22         A.     And I'm not sure -- not on a daily

23    basis, but that would be the only one on a

24    daily basis.

25         Q.     Was there any medication you were
```



```
 1                         McCoy
 2    taking for your spondylitis at the time?
 3           A.    Yes, Humira.
 4           Q.    And what was that for?  Was that an
 5    antiinflammatory?
 6           A.    No, it's among the class of drugs
 7    that are called TNF inhibitors.  They --
 8    essentially they suppress your immune system so
 9    that it can't really attack itself, and it
10    is -- I have to give myself an injection.  At
11    the time, I had someone coming to give it to
12    me, but it's -- I have to give it -- I get it
13    weekly.
14           Q.    So, back in the time of this
15    accident in July of 2019, you were receiving a
16    daily injection of Humira?
17           A.    Weekly.
18           Q.    Excuse me.  Okay.  And now,
19    currently you said you take it daily or did I
20    misunderstand?
21           A.    No, a weekly injection.
22           Q.    Still weekly.  Okay.  And at the
23    time in July of 2019, you had someone giving it
24    to you?
25           A.    Yes, I had a care attendant who
```



```
 1                      McCoy
 2    came regularly.
 3          Q.    When you say "regularly," once a
 4    week --
 5          A.    They came weekly to give it to me.
 6          Q.    Did the care attendant perform any
 7    other functions other than administering the
 8    Humira?
 9          A.    No.
10          Q.    The care attendant, was it the same
11    person every week?
12          A.    Not always.
13          Q.    What facility was the care
14    attendant a part of?
15          A.    I don't remember.
16          Q.    Do you have any records at home
17    which would indicate the agency or the company
18    through which --
19                (Talking over each other.)
20          A.    Yes, it would be somewhere in my
21    files.
22          Q.    Okay.  And when did the care
23    attendant stop coming to give you those
24    injections?
25          A.    It was probably a couple of months
```



```
 1                        McCoy
 2     after that.  Yeah, probably a couple of months
 3     after that.
 4          Q.    For what reason did a home -- or
 5     care attendant, rather, stop coming?
 6          A.    I didn't want them to come anymore.
 7          Q.    Was there any particular reason?
 8          A.    They never came on time and it
 9     wound up being more complicated -- I tend to be
10     an independent person, I try to be an
11     independent person and I was always having to
12     wait for them, and that I never knew who was
13     going to come.  And I decided I would try to
14     give myself the injection.
15          Q.    And you've been able to do that
16     ever since?
17          A.    Yes.
18          Q.    How long were you in the HomeGoods
19     store approximately before your fall took
20     place?
21          A.    A very short amount of time.
22          Q.    What you consider short and I
23     consider short may be different, so let's try
24     and narrow it down a little bit within a number
25     of minutes, a matter of seconds, something
```



```
 1                        McCoy
 2   else?
 3        A.    No, some minutes.
 4        Q.    Would you say less than five
 5   minutes?
 6        A.    I would say between maybe five to
 7   ten minutes.
 8        Q.    This particular HomeGoods, does it
 9   have shopping carts for customer use?
10        A.    Yes, it does.
11        Q.    Did you utilize the shopping cart
12   in any matter that day?
13        A.    At that point, no, because it was
14   very, very near to the front of the store, and
15   they didn't have shopping carts located there,
16   yet.
17        Q.    Were you intending to use a
18   shopping cart if it had gotten to that point?
19        A.    I might have, except that I
20   indicated that I brought the walker for that
21   purpose.
22        Q.    You said before that the walker
23   could also be used as a seat.
24              Can you move in the walker while
25   you're in a seated position?
```



TERESA MCCOY                                                January 18, 2022
MCCOY V. TJX COMPANY                                                     29

```
 1                        McCoy
 2        A.    No.  I mean, you could, I suppose
 3   if you used your feet, but it's not intended to
 4   use -- to be used like that.
 5        Q.    When you first arrived at the
 6   store, I assume you went in through the
 7   entrance door; correct?
 8        A.    Yes.
 9        Q.    Once you went through that front
10   door, can you describe to me what was to your
11   left, to your right and straight ahead?
12        A.    Okay.  To the left, they have a
13   number of displays of merchandise.  And sort of
14   forward and to the left, some -- some sort of
15   like display tables with various things on
16   them, various merchandise.  And basically --
17   yes, and then going straight, if you were to go
18   forward, straightforward, you would see maybe
19   one or two aisles, and again display tables
20   with lots of merchandise on them.
21             To the right, if you passed over the
22   section -- the area where you would exit those
23   doors, there are more like shelf type things
24   with lots of oils and teas and chocolate and
25   things like that, more like food type things.
```



TERESA MCCOY
MCCOY V. TJX COMPANY

```
 1                        McCoy
 2        Q.    Okay.  Now, as you enter the store,
 3   you were using the walker at the time?
 4        A.    Yes.
 5        Q.    Where is the first place that you
 6   went after you entered?
 7        A.    I went off just forward a little
 8   bit to the merchandise on the left.
 9        Q.    What type of merchandise was there
10   in that area?
11        A.    They have a lot of very nice vases
12   and things like that, sort of things that you
13   might display in your home, lots of interesting
14   sort of knick-knacks, vases, trays, some
15   beautiful trays that they sell there, pillows,
16   lamps.
17        Q.    How was that merchandise displayed
18   in that area, was it on shelving units, tables,
19   something else?
20        A.    Well, initially it was on shelving
21   units on these display tables.  Do you want me
22   to -- should I speak about the actual incident
23   where I --
24        Q.    I'm going to get to that.  I just
25   want to kind of take it step by step.  So, when
```



                                    McCoy

1   you first entered the store, you indicated that

2   you walked a little bit forward into the left,

3   to area with --

4        A.   Well, not really to the left

5   because it's not that big, you can pretty much

6   just be in the store like three, four feet and

7   just turn your head to the left and, you know,

8   you're kind of taking it in.  You're not -- you

9   don't necessarily have to sort of go off

10  anywhere, it's very -- it's right there.

11       Q.   And that area right there, which

12  you described now as kind of straightforward

13  where the vases were, in that area, was the

14  merchandise on a display, shelves, tables,

15  something else?

16       A.   I mean, I don't recall.  I'm

17  pretty -- I think that -- I don't recall, but I

18  think that there are sort of display type units

19  along that wall where they have the lamps and

20  vases and things of that nature.

21       Q.   And did you browse in that area for

22  a particular period of time?

23       A.   No, I think I just viewed it.  I

24  even -- I have -- never mind.



```
1                        McCoy
2          Q.    Did you then leave that area and go
3     to a different area of the store?
4          A.    There wasn't an area to leave.   I
5     stayed in that general area.  I just looked at
6     a different -- in a different direction.
7          Q.    What direction did you look in?
8          A.    More straight in front of me.
9          Q.    And when you say straight in front
10    of you, would that be further into the store if
11    I --
12               (Talking over each other.)
13         A.    Maybe a foot or two feet further
14    into the store.
15         Q.    And you began browsing in that
16    area?
17         A.    Not bruising, I noticed this --
18    this stool and I thought it was nice-looking.
19         Q.    When you say you noticed it, where
20    did you see it?
21         A.    It was in front of a display unit.
22         Q.    Can you describe the display unit
23    for me?  Was it a shelf, was it a table,
24    something else?
25         A.    Yes, a kind of like -- kind of like
```



```
 1                    McCoy
 2   a table, not a shelf, like a surface, like a
 3   raised surface area.
 4        Q.    How far raised off the ground was
 5   it?
 6        A.    Maybe three feet.
 7        Q.    And the stool that you saw was
 8   located on the floor in front of that shelf?
 9        A.    Yes, on the floor, a little bit in
10   front.
11        Q.    Was there anything on the shelf
12   itself?
13        A.    Yes, there were other items.
14        Q.    What other items were on the shelf?
15        A.    I don't recall.
16        Q.    Was it one item or more than one
17   item?
18        A.    More than one item.
19        Q.    Were there any other stools similar
20   to the one on the floor located on the shelf?
21        A.    I don't recall.
22        Q.    Can you describe the stool for me,
23   please?
24        A.    Yes.  It had a very sort of crafty
25   look to it, it was sort of like a kind of rope,
```



```
 1                        McCoy
 2   like rope textured seating with like kind of
 3   almost like bamboo legs.  And, you know, I
 4   liked the way it looked, I like that look.
 5        Q.    It had four legs?
 6        A.    It had -- yes, it had four legs.
 7        Q.    What color was the rope texture at
 8   seating part?
 9        A.    Like a natural color.
10        Q.    Like an off-white almost?
11        A.    No, like a tan, like a natural.
12        Q.    What shape was it?  Was it a
13   square, rectangle, circle?
14        A.    It was like a square, the seating
15   area -- the seat area was like -- was a square.
16        Q.    How big was it -- how wide and how
17   long was it?
18        A.    Not very.  You know, enough --
19   enough to -- to hold a person.  It's certainly
20   not enough to hold two people.
21        Q.    Okay.  That was my next question.
22   But it would be enough to hold one person;
23   correct?
24        A.    Yes.
25        Q.    When you observed --
```



```
 1                      McCoy
 2        A.    Can I just get a glass of water?  I
 3   have a glass right here.
 4        Q.    Absolutely.
 5        A.    Thank you.
 6        Q.    Where were you standing when you
 7   first observed the stool, how far away were
 8   you?
 9        A.    Very close, within six inches.
10        Q.    And once you saw the stool, did you
11   take any steps to try it and sit on it at that
12   time?
13        A.    Yes.
14        Q.    In order to get over to the stool,
15   did you use your walker?
16        A.    I was already there.
17        Q.    So, you didn't need to move any
18   closer to it in order to sit on it; correct?
19        A.    No.
20        Q.    Did your --
21        A.    And I probably moved away, you
22   know, from my walker a couple of inches, which
23   was fine.
24        Q.    Okay.  Did your incident take place
25   as you were in the process sitting on the
```



```
 1                        McCoy
 2   stool?
 3          A.     Yes.
 4          Q.     As you were sitting on the stool,
 5   before the point where your fall took place,
 6   were you continuously holding onto the walker
 7   or had you let it go at any point?
 8          A.     No, I don't need to continue -- at
 9   that point, I didn't need to continuously hold
10   onto the walker.  I was able to walk without a
11   walker.  I did bring the walker to HomeGoods
12   because I thought it would help me to carry
13   items back.
14          Q.     At the point when you --
15          A.     So, I just want to make that clear
16   that I didn't need to use it continuously, it's
17   not like I had to always have my hands on it.
18          Q.     And you brought it to help in what
19   sense?
20          A.     Because I thought if I had bags, I
21   could -- you could load them on it and then
22   wheel it home, almost the way you would use a
23   shopping cart.
24          Q.     Okay.  At the point when you began
25   to sit on the stool, were you carrying
```



```
 1                          McCoy
 2     anything?
 3           A.    No.
 4           Q.    Did you have a pocketbook or a
 5     handbag with you?
 6           A.    It was on my walker.
 7           Q.    Do you wear glasses?
 8           A.    Reading.
 9           Q.    Were you wearing any glasses at the
10     time of the incident?
11           A.    No, I don't -- I don't recall.
12           Q.    What was the lighting like in that
13     area where the stool was located?
14           A.    Very bright.
15           Q.    What type of material was the floor
16     made of underneath that stool?
17           A.    I don't know, but it was very hard.
18           Q.    So, it was almost like a tile as
19     opposed to a carpet, would that be accurate?
20           A.    Yes, exactly, no carpet.
21           Q.    Do you know what color the floor
22     was underneath the stool?
23           A.    No, I don't remember.  It was like
24     a light shade.
25           Q.    Other than the stool on the floor,
```



```
 1                      McCoy
 2    was there any other merchandise on the floor in
 3    that area?
 4          A.    Yes, I remember that there was an
 5    odd-looking like vehicle that was on the floor,
 6    like a car, like a larger -- like car, like
 7    almost like something you would see in a
 8    child's room, some sort of shade of red.  And I
 9    remember thinking that it was kind of funny.
10          Q.    Was it the kind of car that a child
11    could sit in and ride, was it that big or
12    something else?
13          A.    No, no, no, no.  More like a child
14    would play with it, move it back and forth, but
15    not like a match car -- not like a Matchbox
16    car, something like that, but, you know, maybe
17    a foot, foot and a half wide -- I mean, long.
18          Q.    How close was the stool to the
19    display unit?  Was it touching it in any
20    manner?
21          A.    No.
22          Q.    Could you estimate in inches or
23    however you can, how far away from the display
24    the stool was located?
25          A.    A couple of inches, maybe six
```



TERESA MCCOY                                      January 18, 2022
MCCOY V. TJX COMPANY                                          39

```
 1                    McCoy
 2    inches.
 3         Q.    You mentioned before that there was
 4    other merchandise on that shelving unit behind
 5    the stool.
 6              Were there any empty areas on that
 7    shelving unit that you can recall?
 8         A.    I don't recall.
 9         Q.    At the time of this incident, what
10    was your height and weight?
11         A.    5'8", most likely 123 pounds.
12         Q.    And has that changed, currently?
13         A.    No, that's pretty much my -- what I
14    intend to weigh.  I mean, give or take a few
15    pounds up and down.
16         Q.    Okay.  Did you have to be anywhere
17    later on that day?
18         A.    No.
19         Q.    Was there anyone else in the area
20    where your fall took place?
21         A.    Yes, there were other customers.
22         Q.    How many?
23         A.    I don't recall.
24         Q.    Was it more than three?
25         A.    I really don't recall.
```



```
                        McCoy
 1

 2        Q.     Were there any --

 3        A.     It wasn't like twenty, it wasn't

 4   like ten.  So, under ten.

 5        Q.     Were there any customers in that

 6   area of your fall before your fall took place?

 7        A.     I'm sorry?

 8        Q.     Any employees, I think I said

 9   customers --

10        A.     In the area?

11        Q.     Yes.

12        A.     Yes.  There was a security guard.

13        Q.     And did you first observe him

14   before your fall took place?

15        A.     Yes, yes.

16        Q.     How long before?

17        A.     As soon as I entered the store.

18        Q.     And was he posted at the front door

19   when you entered?

20        A.     Close to the front door.  This was

21   all very close to the front door.

22        Q.     How far away was the tool from the

23   front door to the best you can approximate?

24        A.     Well, you would enter the front

25   door, the doors open, they're automatic doors
```



```
 1                    McCoy
 2  and, I don't know, six feet, maybe.  Maybe six,
 3  eight feet.
 4       Q.    So, from where the security guard
 5  was standing at the front door, he would be
 6  able to see, to the best of your knowledge, the
 7  area where the stool was located?
 8       A.    Oh, yes, he was very close to it.
 9       Q.    And how do you know this individual
10  was a security guard?  Did he have any type of
11  uniform on?
12       A.    Yes, he did.
13       Q.    What type?
14       A.    He had the kind of uniform that you
15  see on a security guard.  You know, it was -- I
16  think he might have even had -- I don't recall
17  if it was a blue uniform or something, but it
18  was some form of uniform and I understood it to
19  be that he was the security guard.
20       Q.    Did you see him carrying a weapon
21  of any sort?
22       A.    No, I don't remember that.
23       Q.    And you don't recall the color of
24  the uniform?
25       A.    No, I don't.
```



```
                          McCoy
1
2        Q.    Did it look like a policeman's
3   uniform almost?
4        A.    Not exactly.  Not as official and,
5   you know, not as official, not with all the
6   get-up that you see on an officer.
7        Q.    Can you describe what he looked for
8   me, please, approximate age, skin color, the
9   best you can recall?
10       A.    I know that he's an
11  African-American man.  He was on the thin side.
12  He might have been late 30s, 40.  That's what I
13  recall.
14       Q.    During any other point when you
15  were at the store that day, did you observe any
16  of the other HomeGoods employees, whether it be
17  the manager, salesperson, anyone --
18       A.    Yes, yes, the manager.
19       Q.    Okay.  Were they wearing any type
20  of uniform?
21       A.    He was not -- the manager was not,
22  no.
23       Q.    Were there any associates that you
24  observed walking around that were wearing any
25  types of uniforms?
```



```
                            McCoy
 1
 2        A.      No.
 3        Q.      Did you see anyone else wearing the
 4   same type of uniform that the individual
 5   standing at the front door was wearing?
 6        A.      No, I -- no, I don't think so.
 7        Q.      Okay.  When you first entered the
 8   store that day, did you speak with the security
 9   guard at all?
10        A.      Did I speak with him?
11        Q.      When you first entered the store.
12        A.      I probably said hi, hello.
13        Q.      Did he say anything back that you
14   can recall?
15        A.      He might have said hi, he might
16   have -- it was just a sort of, you know, the
17   basic greeting that you give to people.
18        Q.      Now, back to the area where the
19   stool was located, describe for me what
20   happened as you began to sit on the stool.
21        A.      It just seemed to crumble under me,
22   and I just crashed to the floor.
23        Q.      Did you sit your bottom entirely on
24   the seat before it began to crumble?  In other
25   words, had you put your full weight on the seat
```



```
 1                        McCoy
 2   before it began to crumble or something else?
 3        A.    I can't remember if my entire
 4   weight was on the seat or partial.  I remember,
 5   you know, a good -- certainly it was enough of
 6   me to -- for it to crumble.
 7        Q.    And when you say "crumble," do you
 8   mean it went down towards the ground?
 9        A.    Yes, it just -- yes, it seemed to
10   have sort of just give way under me.
11        Q.    And did you land on the ground.
12        A.    I landed on the ground, on the
13   floor, yes.
14        Q.    Was the rope part still underneath
15   you when you landed?
16        A.    No, they just sort of fell -- they
17   just fell.
18        Q.    In what manner did they fall?  Did
19   they fall to the side, forward, something else?
20        A.    You know, at that moment, I wasn't
21   really thinking where is the stool, I was in a
22   lot of -- I was in pain, I hit myself pretty
23   hard and I was pretty much in shock.  So, I
24   don't know, but it was close to me, you know,
25   it -- when you -- it fell nearby me.
```



```
 1                       McCoy
 2        Q.     After you fell, when is the first
 3   point when you observed the stool?
 4        A.     Well, I observed -- at some point,
 5   I observed, and I don't recall if it was after
 6   somebody helped me up that I observed that, in
 7   fact, it was two stools.
 8        Q.     So, was it your understanding at
 9   the point in time when you sat down, that you
10   were sitting on one stool?
11        A.     Yes.
12        Q.     And then, in fact, after the fall,
13   you learned that it was two stools?
14        A.     Yes.
15        Q.     Had the stools been stacked one on
16   top of another --
17        A.     Yes.
18        Q.     Right next -- right on top of
19   another.  Okay.
20               How much time passed from the moment
21   when you first saw the stool and the moment
22   when you sat down on it?
23        A.     Not a lot of time, you know, you
24   look at something, you -- piece of furniture,
25   you think oh, that's nice, let me see if it's
```



TERESA MCCOY                                          January 18, 2022
MCCOY V. TJX COMPANY                                               46

```
 1                    McCoy
 2  comfortable, you know, it might have been a
 3  minute, a minute and a half.
 4        Q.   And were you looking at the tool
 5  that entire minute, minute and a half --
 6        A.   Yes, I was taking it in.  I was
 7  taking it in visually, you know, the aesthetics
 8  of it, the color.
 9        Q.   Did you touch it with your hand at
10  all before you began to sit on it?
11        A.   Yes, I touched the top of it, that
12  rope -- that sort of rope and rope texture.
13        Q.   And did you look at the leg portion
14  at all before you sat on the stool?
15        A.   I just recall it looking as if it
16  was, you know -- it was like a wooden leg, like
17  a bamboo type of legs, other than that --
18        Q.   Do you recall seeing how many there
19  were before you sat on it?
20        A.   It was one.  I mean, I saw it as
21  one, the way it was stacked, it looked as if it
22  was one.
23        Q.   I meant how many legs?
24        A.   Oh.  No, I don't remember if I
25  thought to myself how many legs are there.
```



```
 1                         McCoy
 2        Q.    So, as you sit here today, do you
 3   know in what manner the stools moved when you
 4   sat on it?  Because I understand you didn't
 5   necessarily see it until afterwards.
 6           Do you know if they toppled over, slid
 7   out from underneath, the legs broke, any other
 8   thing like that?
 9        A.    Nothing broke.  It -- yes, it felt
10   like it toppled over, it toppled down and over.
11        Q.    When you say "over," over to the
12   left, over to the right?
13        A.    I don't remember if it was over to
14   the left or over to the right.  I was pretty
15   much concerned with me at that point.
16        Q.    Understood.  When you observed the
17   stools for the first time after the fall, did
18   you see any broken portions of either stool?
19        A.    No.
20        Q.    Where were the stools located in
21   relation to each other when you first saw them?
22   Were they still one on top of another, were
23   they next to each other, something else?
24        A.    When I first them after the fall?
25        Q.    Correct.
```



```
 1                         McCoy
 2        A.     They were on the floor next to each
 3   other, it -- yes.  When the manager eventually
 4   came over, he was the one who said to one of
 5   the employees get these up off the floor, they
 6   shouldn't be here.
 7        Q.     When you say they were next to each
 8   other, were they touching each other?
 9        A.     I don't remember.
10        Q.     Okay.  I'm just going to show you
11   two photographs that we marked, and ask you a
12   couple of questions about them.
13        A.     Okay.
14             (Discussion off the record.)
15   BY MS. AZZARETTO:
16        Q.     I'm going to show you what's been
17   marked as Defendant's Exhibit A for
18   identification.
19             (Exhibit A was so marked for
20   identification.)
21   BY MS. AZZARETTO:
22        Q.     Do you know what's depicted in that
23   photograph?
24        A.     Yes, that's one of the stools.
25        Q.     Does that appear to be the same
```



```
 1                        McCoy
 2    stool that was involved in your incident?
 3         A.    Yes, it does.
 4         Q.    Is there anything different about
 5    the way the stool looks in that photograph than
 6    how it looked on the date of incident,
 7    understanding that you -- it's your testimony
 8    that they were one on top of each other, and in
 9    this photograph they're not one on top of each
10    other, but just with regard to how it looks
11    physically, is there anything different?
12         A.    Yes, it's on its side.
13         Q.    Okay.  But is it structurally
14    different in any way?  It's just positioned
15    differently; correct?
16         A.    From I can see, it looks like it
17    was the same.
18         Q.    And there's another stool located
19    directly to the left?
20         A.    Yes.
21         Q.    Do you know if that was the second
22    stool that was involved in your incident?
23         A.    I -- from what I can -- I only have
24    a sliver of it in my -- on my computer.
25         Q.    Okay.  Is Defendant's Exhibit A a
```



```
 1                        McCoy
 2      fair and accurate representation of how the
 3      stools appeared on the date of your incident,
 4      again, not with regard to positioning, just
 5      physically how they look?
 6           A.    Yes.
 7           Q.    Okay.
 8           A.    And not with regard to the fact
 9      that they were one on top of each other; right?
10           Q.    Understood.
11           A.    Okay.
12           Q.    I just want to make sure that we're
13      looking at the same stool, basically --
14           A.    Yes.
15           Q.    -- and I understand it was
16      positioned differently.
17           A.    Yes.
18           Q.    If we can take a look at
19      Defendant's Exhibit B I just want to ask you
20      about, that one has a better view of what it's
21      sitting on (indicating).
22                 (Discussion off the record.)
23      BY MS. AZZARETTO:
24           Q.    Ms. McCoy, can you see this
25      photograph?
```



```
 1                        McCoy
 2        A.    Yes, I can.
 3              MS. AZZARETTO:  Can you scroll down
 4        just a little bit more?
 5              (Discussion off the record.)
 6  BY MS. AZZARETTO:
 7        Q.    Now, this is what we've marked as
 8    Defendant's Exhibit B for identification.
 9              (Exhibit B was so marked for
10    identification.)
11  BY MS. AZZARETTO:
12        Q.    Does this photograph also show the
13    two stools that appear to be the same ones
14    involved in your incident?
15        A.    Yes, it does.
16        Q.    And as you could see, they appear
17    to be sitting on what looks like a white table
18    of some sort; is that correct?
19        A.    Yes.
20        Q.    Is that the same type of table that
21    was located directly behind the stools on the
22    date of your incident?
23        A.    Yes, that's what I described as the
24    display units.
25        Q.    Okay.  That is the same unit from
```



```
                            McCoy
 1
 2    what you can tell in looking at Defendant's
 3    Exhibit B?
 4         A.    Yes, I'm pretty sure.
 5         Q.    Do you see on the bottom left-hand
 6    side of that white --
 7         A.    Yes.
 8         Q.    -- display unit there what appears
 9    to be a red toy of some sort?
10         A.    Yes.
11         Q.    Is that the red toy that you were
12    referring to --
13         A.    Yes, it is.
14         Q.    Do you know who took Defendant's
15    Exhibit A and Defendant's Exhibit B?
16         A.    I did.
17         Q.    How many photographs did you take
18    total at that time?
19         A.    I think just these two.
20         Q.    Were these photographs taken on the
21    same day as your incident?
22         A.    Yes, they were.
23         Q.    How long after?
24         A.    Within ten minutes, 15 minutes.  At
25    that point, I had been helped up.  I know I was
```



```
 1                        McCoy
 2      bleeding, they were getting me Band-Aids.  So,
 3      I was seated on a bench nearby, and I took it,
 4      then.
 5            Q.    Did you take it with your phone or
 6      something else?
 7            A.    Yeah, I took it with my phone.
 8            Q.    Do you still have those photographs
 9      saved on your phone?
10            A.    I probably downloaded them to my
11      computer.
12            Q.    Your camera went off again.
13            A.    Oh, I'm sorry.
14                  (Discussion off the record.)
15      BY MS. AZZARETTO:
16            Q.    Did you ever take any photographs
17      on any later dates after the accident took
18      place?
19            A.    At the store?
20            Q.    Yes.
21            A.    No.
22            Q.    Are you aware of anyone else taking
23      any photographs of the area where the fall took
24      place?
25            A.    No, I'm not.
```



```
 1                      McCoy

 2        Q.    Now, when you fell to the ground,

 3    were you able to get up on your own or did you

 4    require assistance?

 5        A.    I required assistance.

 6        Q.    And who assisted you?

 7        A.    I don't recall whether it was a

 8    customer who was nearby or whether it was the

 9    manager, who at that point -- no, I don't think

10    it was the manager because it took him a bit to

11    come, so I don't remember.  I think it might

12    have been a customer.

13        Q.    How long were you on the floor

14    before you were helped up?

15        A.    I don't recall.  A minute, less

16    than a minute.  I mean, it took me a while to

17    sort of maneuver myself in such a way that I

18    could get up, you know, I hit pretty hard.

19        Q.    What is the first body part of

20    yours that landed on the ground?

21        A.    My side -- my right side.  I'm not

22    sure if it was -- I might have landed on my hip

23    area and the arm or the hip and to the right of

24    the torso.

25        Q.    So, you landed somewhere on the
```



```
 1                        McCoy
 2   right hip torso area?
 3        A.    The right side of my torso, yes.
 4        Q.    And were you kind of laying on the
 5   ground at that point --
 6        A.    Yes, I was laying on the ground?
 7        Q.    On your right side?
 8        A.    Yes.
 9        Q.    And how long did it take for
10   someone to come over to you?
11        A.    I don't remember.  It was -- people
12   came over rather quickly.
13        Q.    Okay --
14              (Talking over each other.)
15        A.    I just remember somebody saying,
16   "Oh, my God, help her up, get her up."
17        Q.    Was it a matter of seconds, a
18   matter of minutes, just the best you can
19   recall?
20        A.    Until I was helped up?
21        Q.    Yes.
22        A.    Not seconds.  A minute, probably.
23        Q.    Okay.  And you believe that you
24   weren't sure if it was a customer or someone
25   along those lines who helped you up; correct?
```



```
 1                        McCoy
 2         A.    I believe so, yes.
 3         Q.    Was it male or female?
 4         A.    I don't remember.
 5         Q.    Was it one person or more than one
 6  person that physically helped you up?
 7         A.    I think it was just one person.
 8  There were a number of customers around, but I
 9  think it was just one person who helped me up.
10         Q.    And in what way did that person
11  physically help you up?  Did he or she put
12  their hands under your arm or something else?
13         A.    No, they reached out their hand so
14  that I could hold their hand and arm to steady
15  myself, to get up.  I don't recall them putting
16  any hands under my -- their hands under my arm
17  or that sort of thing.
18         Q.    Okay.  And in doing that --
19         A.    I know I had to sort of probably
20  get myself to my knees first, and then, you
21  know, slowly get up that way.  So, they helped
22  to steady me.
23         Q.    And then eventually you were able
24  to pull yourself up to a standing position;
25  correct?
```



```
1                    McCoy

2        A.    Yes.

3        Q.    During this time period, did you

4  have any conversations with the person that was

5  physically extending their arm to you?

6        A.    I don't recall.

7        Q.    Now, you indicated there were other

8  customers in the area.

9              During the point in time that you were

10 getting up, did you have any conversations with

11 any of those individuals?

12       A.    I don't recall.

13       Q.    Do you know the names of any of the

14 customers that were in the area after your

15 incident?

16       A.    No, I don't.

17       Q.    Are you aware if any of those

18 customers actually saw you fall?

19       A.    I don't -- I'm not aware of it, I'm

20 not -- I can't tell.

21       Q.    You've indicated before there was a

22 security guard standing by the door.

23             To your knowledge, did the security

24 guard actually witness you fall?

25       A.    I would imagine that he did, but I
```



```
                           McCoy
 1
 2   can't speak for another person.
 3        Q.    Well, did he ever say anything to
 4   you to indicate he had seen you fall?
 5        A.    No, he -- I don't recall him saying
 6   anything to me.  I know he did say -- he was
 7   the first person to say you're bleeding, do you
 8   need a Band-Aid, you know, can I get you some
 9   sort of Band-Aid or something like that?  He
10   pointed it out to me that I was bleeding, so I
11   assume he came over to the area where the fall
12   took place.  He was very close to the area, as
13   I said initially, he was very, very close, so
14   he didn't have to come over other than maybe
15   walk a step or two.
16        Q.    And now, you had a conversation
17   with him at some point, obviously; correct?
18        A.    Yes, I was very -- it was very
19   distressing.
20        Q.    When you first spoke with the
21   security guard, was it while you were still on
22   the ground, while you were in the process of
23   getting up or while you were already up?
24        A.    No, probably when I was already up.
25        Q.    Now, the first time that you
```



```
                               McCoy
 1
 2    observed the two stools after the incident,
 3    were you in the process of getting up, already
 4    standing up or something else?
 5         A.    I don't recall.
 6         Q.    Now, when you ultimately had a
 7    conversation with the security guard, please
 8    tell me in sum and substance what he said to
 9    you and what you said in response, if anything?
10         A.    Well, he did point out that I was
11    bleeding.  He asked if I needed some sort of,
12    you know -- could he get me a Band-Aid or a
13    bandage, and then I remember that I was very
14    upset and I said, "What happened?  How is that
15    two stools?  What happened?  That looked like
16    it was one stool.  And you have this other
17    thing here, this car here, what is going on?"
18    I mean, I was sort of, you know, ranting about
19    like the condition of what had just happened.
20         Q.    What did he say, if anything, in
21    response?
22         A.    I don't remember what he said.  I
23    know that when the manager did come, he did
24    instruct someone, I don't know if it was the
25    security guard or another employee, he
```



```
                        McCoy
 1
 2   instructed someone to get these things off the
 3   floor.
 4        Q.    And I'll get to the manager, I just
 5   want to get through the guard first, we need to
 6   do them one at a time.
 7        A.    Oh, okay.
 8        Q.    So, other than what you've already
 9   told me, did any other conversations take place
10   between you and the guard?
11        A.    He might have said, "Should I call
12   an ambulance?"  That might have been the
13   manager, but he might have said it.  Somebody
14   said it, "Should we call an ambulance?"
15        Q.    And what was your response to that?
16        A.    At the time, I probably said, "No,
17   don't call an ambulance."
18        Q.    And why did you not want an
19   ambulance called?
20        A.    Because at the time I remember
21   thinking, you know, I don't want to deal with
22   the whole hassle of being -- wait for an
23   ambulance to come and then go to an emergency
24   room and go to a hospital and be checked out,
25   and it's just going to be like a whole day and
```



```
                           McCoy
 1
 2     night thing and, you know.  And I thought to
 3     myself, you know, I'm sure I will be okay,
 4     yeah, I'm bruised and I'm bleeding, but I want
 5     to be okay, so I'll just be okay.
 6             Q.    Where were you bleeding from?
 7             A.    I was bleeding on my arm.
 8             Q.    Your right arm?
 9             A.    Yes, my right arm, near my elbow, I
10     think.  I think there were a couple of places,
11     I might have been bleeding on my leg, as well,
12     near my knee.
13             Q.    That's your right leg?
14             A.    Yes.
15             Q.    So, near the right elbow, near the
16     right knee, anywhere else?
17             A.    I don't remember, no, I don't
18     recall.
19             Q.    Were you feeling pain in any parts
20     of your body at that point?
21             A.    Sure.
22             Q.    Where?
23             A.    Pretty much all over.
24             Q.    Your entire body?
25             A.    Yeah, it felt like, you know, I had
```



```
1                         McCoy
2    just kind of sustained a blow.
3         Q.    How would you describe the impact
4    with which the fall took place, was it hard,
5    medium?
6         A.    Very hard.  I feel like I can still
7    almost hear like the slap of my body hitting
8    the floor.
9         Q.    Did you hear any cracking or
10   breaking noises, so to speak, as it was
11   happening?
12        A.    No.
13        Q.    Did the car factor into your
14   incident in any way?
15        A.    No.
16        Q.    Did you lose consciousness at all?
17        A.    No.
18        Q.    Now, when you were in the process
19   of sitting down on the stool, where were you
20   looking?
21        A.    I don't remember, I don't recall.
22   Most likely in the, you know -- I was probably
23   looking -- I don't recall.
24        Q.    Let me ask it this way --
25        A.    But not off to another part of the
```



```
1                       McCoy
2    store.
3         Q.    I'm trying to figure out how you
4    were positioned, so let me ask it a different
5    way.  When you began to sit on the stool, what
6    direction was your face --
7         A.    Oh, okay.  I would be looking out
8    of the store.
9         Q.    Toward the sidewalk?
10        A.    Yes, toward the sidewalk.
11        Q.    But you don't recall specifically
12   where you were looking at the time; is that
13   fair?
14        A.    No.
15        Q.    Okay.
16        A.    I might have been looking down, I
17   might have, you know -- but the stools, because
18   they were in front of that display unit, I
19   couldn't get to the other side of them.  So, in
20   order to sit on them, I would be facing
21   outward.
22        Q.    When you say "facing outward," what
23   do you mean?
24        A.    Towards the outside of the store.
25        Q.    Your body was facing the outside of
```



```
 1                    McCoy
 2    the store?
 3         A.    Yes.
 4         Q.    Did you lose consciousness at all?
 5         A.    No.
 6         Q.    After the individual helped you up
 7    at that point, was the manager in the area,
 8    yet?
 9         A.    If not at that moment, very soon
10    after.
11         Q.    Were you helped to a seat by
12    somebody?
13         A.    Yes, somebody helped me.  There was
14    a bench nearby and I was helped to the bench.
15         Q.    Is that immediately once you got up
16    or did you stand for a period of time?
17         A.    It was a few feet away.
18         Q.    But did you do it right away?
19         A.    They helped me up and they helped
20    me over to the bench.
21         Q.    And by "they," is that the
22    customers that were in the area that you
23    referenced before?
24         A.    Yes, yes.
25         Q.    And other than what you've already
```



```
                          McCoy
 1
 2    told me, do you remember having any other
 3    conversations with any customers in the area at
 4    that time?
 5         A.    Probably just that it was just so
 6    chaotic, the situation with the stools, that it
 7    turned out to be two stools, this red car and
 8    just how sort of haphazard everything seemed to
 9    be in that area, the display seemed to be very
10    haphazardly done.
11         Q.    And why do you say that?
12         A.    Just that it wasn't -- there wasn't
13    a sense of order to it, it was kind of very
14    messy.
15         Q.    Other than the car and the stools,
16    were there any other items on the floor?
17         A.    Not that I recall.
18         Q.    And again, the car didn't come into
19    play in the accident in any way; correct?
20         A.    No, but it was very close to it, so
21    I feel, you know -- so, when I fell, I feel
22    like I fell very close to that red car, as
23    well.
24         Q.    But you didn't strike it any manner
25    correct?
```



```
 1                        McCoy
 2        A.     No, I don't -- I don't remember.    I
 3   don't think so.
 4        Q.     Did the display table behind the
 5   shelf appear overcrowded in any way?
 6        A.     Yes.
 7        Q.     How many items were on that
 8   display?
 9        A.     The display behind the -- the one
10   that the stools were eventually put on?
11        Q.     I'm talking about the one that was
12   the white display that was in the photographs,
13   you indicated that appeared to be the same
14   display table that was behind the shelf on that
15   day; is that accurate?
16        A.     Not behind the shelf.  Behind the
17   stools.
18        Q.     The stools, excuse me, that's what
19   I meant.  Okay.  That's what I'm referring to,
20   I'm asking if that was overcrowded in any way?
21        A.     Yes, there were a lot of things on
22   there, but it's true that -- they do tend to
23   sort of load things up.
24        Q.     Did you see any employees putting
25   any merchandise on that shelving unit while you
```

TERESA MCCOY                                      January 18, 2022
MCCOY V. TJX COMPANY                                            67

```
1                          McCoy
2     were present?
3          A.    No.
4          Q.    Do you know how many items of
5     merchandise --
6               (Talking over each other.)
7          A.    Oh, I'm sorry.  While I was present
8     after the fall?
9          Q.    Before the fall.
10         A.    No, I don't recall.
11         Q.    Did you see anyone loading more
12    merchandise onto that white display table after
13    the fall?
14         A.    They loaded the stools on the --
15    the manager told someone to get the stools up
16    and to move the red car.
17         Q.    Was there room on that display
18    table to put the shelves onto after the fall
19    or --
20         A.    To put the stools onto.  At that
21    time, there must have been because at that --
22    but at that point, I wasn't really sort of
23    looking at what they were doing afterwards to
24    the stools, I was in pain and I was in shock,
25    and I was sort of trying to figure out like
```



```
                            McCoy
 1
 2   what just happened and what should I do?
 3        Q.    Let's talk about the manager.  Is
 4   it male or female?
 5        A.    Male.
 6        Q.    Do you know his name?
 7        A.    I have it down somewhere, I think.
 8   He gave it to me.
 9        Q.    Can you describe for me what he
10   looked like?
11        A.    He was a White guy and he was maybe
12   40s.  He had a shirt on, he didn't have a
13   jacket, he had a shirt on and maybe jeans or
14   khakis or something like that.  That's all I
15   really remember.
16        Q.    Now, when he came over to you, did
17   you have a conversation with him?
18        A.    Yes, yes.
19        Q.    What did he say to you and what did
20   you say to him?
21        A.    He said, "Oh, my God, are you okay?
22   I'm so sorry."  And I said -- I told him what
23   had happened and he said, "This is not your
24   fault at all, they shouldn't have been there,
25   this shouldn't have been there like that."  And
```



```
 1                        McCoy
 2    that's when he instructed, it was either the
 3    security guard or another employee to get the
 4    stools, get everything off the floor.
 5         Q.    And did you see who it was who
 6    physically put the stools back on the shelves?
 7         A.    No, I didn't.
 8         Q.    Was that done while you were there,
 9    though, if you recall?
10         A.    Probably, yes.
11         Q.    Only if you remember, I don't want
12    you to guess, do you remember seeing it?
13         A.    I wasn't paying attention at that
14    point to what they were doing with the stools.
15    You know, he was asking me -- I do recall very
16    clearly that he said, "This is not your fault."
17    And he asked me how I was, what did I need, did
18    I need an ambulance?  You know, he gave me his
19    information and --
20         Q.    Did he -- I'm sorry, were you done?
21         A.    Yes.
22         Q.    Did he tell you where the stools
23    were supposed to be?
24         A.    No.
25         Q.    Did he take down any type of report
```

```
 1                        McCoy
 2   while you were in the store?
 3        A.    I remember he did take information
 4   down, yes.
 5        Q.    What information did he take down?
 6        A.    He took my name, my phone number.
 7   I'm not sure if he took my address.  I -- as I
 8   said, I indicated to him what had happened, so
 9   he most likely took that down, as well.  But I
10   don't remember whether there was like an
11   official form he was filling out.
12        Q.    Did you sign anything that day?
13        A.    No, I don't think so.
14        Q.    Did he give you a copy of any
15   report that day?
16        A.    No.
17        Q.    Other than --
18        A.    He gave me his name and number and
19   said he was the manager and -- and I think that
20   was it.  He was very nice, he was very nice.
21        Q.    Do you still have that piece of
22   paper at home?
23        A.    I don't know if I still have the
24   piece of paper.  I know I transferred the
25   material at one point to my computer.
```



```
 1                       McCoy
 2        Q.    Other than -- withdrawn.
 3             After that initial conversation you
 4   had with the security guard that we already
 5   spoke about, did you ever speak with him again
 6   at that point or was that the only one?
 7        A.    I think that was it, yes, that was
 8   it.
 9        Q.    Other than the security guard, the
10   manager that we already spoke of and the
11   unknown customers that were in the area, did
12   you have any conversations with anyone else at
13   the store that day after the fall?
14        A.    Yes, I stayed in the store.
15        Q.    For how long?
16        A.    A period of time, I continued to
17   shop.
18        Q.    Before the point when you began to
19   shop again, is there anyone else you spoke to
20   about the incident that we haven't discussed
21   already, before you got up and continued to
22   shop?  I just want to make sure I'm not missing
23   anybody.
24        A.    No, no.
25        Q.    Do you know how long those stools
```



```
 1                      McCoy
 2    had been on the ground in that location before
 3    your fall?
 4          A.    I have no idea.
 5          Q.    Do you know how they got to be put
 6    in that position?
 7          A.    No, I don't know anything about
 8    that, no.
 9          Q.    Are you aware of any prior
10    complaints being made to anyone at HomeGoods
11    about the existence of merchandise such as
12    stools on the floor?
13          A.    No.
14          Q.    Are you aware of any prior similar
15    incidents occurring to someone else on the
16    premises?
17          A.    No.
18          Q.    Have you been back to the store
19    since?
20          A.    Yes.
21          Q.    And have you had any conversations
22    with anyone on those subsequent visits about
23    your accident?
24          A.    No.
25          Q.    How many times have you been back
```



TERESA MCCOY                                              January 18, 2022
MCCOY V. TJX COMPANY                                                    73

```
                              McCoy
 1
 2    to the store since?
 3         A.    Once or twice.
 4         Q.    Did you have any conversations on
 5    the phone with anyone from either the store or
 6    a representative of the store after the
 7    accident?
 8         A.    I know somebody called me from an
 9    insurance company.  I don't know whether I
10    spoke with them or whether they just left a
11    voicemail message.
12         Q.    Now, there came a time after you
13    gave your information and spoke with the
14    manager that you continued to shop; correct?
15         A.    I went downstairs, yes.
16         Q.    Did you end up ever purchasing the
17    stools?
18         A.    No.
19         Q.    After you left area of the stools
20    after the fall, did you go immediately
21    downstairs or did you browse in any other areas
22    first?
23         A.    No, I think I went to the back, to
24    the elevator and went downstairs.
25         Q.    And you used the walker at that
```



```
 1                         McCoy
 2    time?
 3          A.     Yes.
 4          Q.     How long did you browse downstairs
 5    for?
 6          A.     I don't know, 30 minutes.
 7          Q.     Did you have any difficulty walking
 8    during that time?
 9          A.     I was using the walker, I remember
10    I started to feel -- towards the end of the 30
11    minutes, 40 minutes when I was on line getting
12    ready to pay for a few items, I started to feel
13    like I was in pain.
14          Q.     Where?
15          A.     Just in my body, in general, in my
16    body.
17          Q.     Had the bleeding stopped at the
18    point when you began shopping again?
19          A.     I don't remember because I think I
20    had a Band-Aid on me, so it's not like I could
21    see whether I was still bleeding or not.
22          Q.     So, after the approximate 20
23    minutes downstairs, had you --
24          A.     A little bit longer, 30 minutes,
25    and then I remember there was a long line to
```

